Horst A. **EIBERGER, d/b/a Atlanta Dictating and Business Equipment Co., and ABP, Inc., Plaintiffs-Appellees,**

v.

**SONY CORPORATION OF AMERICA, Defendant-Appellant.**

No. 128, Docket 78–7625.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1979.

Decided May 2, 1980.

Robert G. Levy, Baltimore, Md. (Berryl A. Speert, Allan P. Hillman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., Charles A. Latorella, Jr., New York City, on brief), for plaintiffs-appellees.

Asa D. Sokolow, New York City (Charles A. Crum, Douglas N. Gordon, Rosenman Colin Freund Lewis & Cohen, New York City, on brief), for defendant-appellant.

Before MESKILL and KEARSE, Circuit Judges, and DOOLING, District Judge.*

* Honorable John F. Dooling, Jr., Senior Judge of the U.S. District Court for the Eastern District of New York, sitting by designation.

KEARSE, Circuit Judge:

Sony Corporation of America ("Sonam"), the defendant below, appeals from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge*, awarding $153,-416.05 in damages to plaintiffs Horst A. Eiberger, sole proprietor of Atlanta Dictating and Business Equipment Co., and ABP, Inc., Eiberger's wholly-owned corporation (hereinafter collectively referred to as "ABP") for injury resulting from violation of the antitrust laws by Sonam. ABP, an authorized dealer of Sony office dictation equipment from 1972 until 1976, charged that Sonam's exaction of "warranty fees" for extraterritorial sales and its termination of the ABP dealership because of ABP's refusal to pay such fees, violated § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). After a bench trial the district court found that Sonam's warranty fee system amounted to a vertical territorial restriction on resale by Sony dealers, which unreasonably restrained trade in violation of § 1, and also found that the system was implemented as a result of Sonam's collaboration with a horizontal conspiracy among other Sony dealers, which was *per se* unlawful under § 1.

On appeal, Sonam challenges the sufficiency of the evidence underlying the district court's determinations of liability, the appropriateness of the legal theories applied, and the calculation of ABP's damages. We affirm the district court's determination of liability on the ground that Sonam's warranty fee system constituted an unreasonable vertical restraint of trade, but remand because we conclude that the district court's findings as to damages are not fully supported by the record.

## I

### A. Sonam's Dealer Network and the Warranty Fee System Prior to 1975

Sonam is the wholly-owned American sales subsidiary of Sony Kabushiki Kaisha of Japan, a leading manufacturer of electronic equipment, instruments and devices. In 1971, Sonam introduced Sony's line of electronic office dictation equipment to the United States. Initially, Sonam sold this dictation equipment directly to consumers, through regional sales offices. This method of distribution was quickly abandoned in favor of a network of authorized Sony retail dealerships, franchised in various locations. By 1975, Sonam had climbed to fifth place among the more than twenty manufacturers of office dictation equipment, with a national market share of 12%; the top five manufacturers accounted for 96% of sales. A Sony handbook stated that Sonam was the fastest growing of all "input word processing equipment" companies and that sales were expected to increase.

Sonam entered into identical written contracts with all of its dealers. Each agreement related to a specified geographical area and provided that the dealer would "primarily devote and otherwise concentrate its operations in the retail sale" of Sony products in that area. The agreement stated that it was not intended to restrict dealers to sales within their territories and that the territories covered by the franchise were non-exclusive.[1]

Sonam provided to consumer-purchasers of its dictation machines a warranty offering free repair service for 90 days, and free parts replacement for one year, from the date of sale. The dealership agreement imposed on the dealer responsibility for providing required warranty service on all

---

1. The entire provision, ¶ FIRST, B, reads as follows:

 It is understood that nothing herein contained shall be construed as intended to restrict the Dealer to sales solely within the Territory hereinabove indicated; it being, however, the intention of the parties that the Dealer shall primarily devote and otherwise concentrate its operations in the retail sale of the Products to the Territory. Similarly, nothing herein contained shall be construed as intended to grant to the Dealer an exclusive right to effect sales of the Products in the said Territory, the franchise herein granted being for all purposes on a non-exclusive basis.

Sony machines that he sold.[2] In addition, it was generally expected (although not embodied in the dealership agreement until April 1975) that a dealer would provide his customers with instruction in the proper use of the equipment. Sonam referred to this instruction service as "installation." Sonam did not specifically compensate its dealers for providing warranty service or "installation," but rather expected that its dealers would cover these costs out of the margin between their purchase price and Sonam's suggested list price.

Prior to April 1975 the dealership agreement also allowed a selling dealer to transfer warranty responsibilities to another dealer, by paying the latter a fee in accordance with a schedule of "warranty fees" attached to the agreement. The latter dealer, when the selling dealer requested and made the proper payment, was required to "accept complete responsibility for" providing warranty service on machines he did not sell.[3] It was never certain that the non-selling dealer would actually have to perform any warranty service; but if the selling dealer made the request and paid the scheduled fee, the non-selling dealer was responsible for such warranty service as might be required. This system facilitated extraterritorial sales by enabling a selling dealer to transfer warranty responsibility to a dealer closer to the customer. It was not uncommon for a selling dealer to ship the equipment to the other dealer rather than directly to the customer, or to request the other dealer to deliver out of his own stock, so that the latter dealer would not only be available to provide warranty service, but could provide "installation" service as well. During this period, a selling dealer was not required to pay a fee merely because he sold equipment in the territory of another Sony dealer. The seller could

elect to perform warranty and "installation" services on these sales himself. If he did so, there was no reason for him to make a request or to pay any fee to the local dealer. Sonam itself was not formally involved in transactions under this system.

B. *ABP's Activities and Dealer Reaction to Them*

For some years prior to 1972, Eiberger had been an experienced dealer in dictation equipment, operating primarily in Atlanta, Georgia. In the spring of 1972, Eiberger's sole proprietorship, Atlanta Dictating and Business Equipment Co., became Sony's authorized dealer in the Atlanta metropolitan area. In 1973, Eiberger transferred this dealership to his wholly-owned corporation, ABP. Sales of Sony dictation equipment soon accounted for roughly half of ABP's business.

In early 1974, ABP began to sell Sony dictation machines, in wholesale quantities, to Seigfried Williges, who was a former business associate of Eiberger and who had himself been an authorized Sony dealer in the Tampa, Florida area until 1973. As an authorized dealer, Williges had a network of sub-dealers throughout Florida, to whom he had given both sales and service training. After it terminated Williges' dealership in 1973, Sonam had enfranchised and begun to deal directly with the sub-dealers in the network established by Williges. In 1974 when Williges began to obtain Sony equipment from ABP, he entered into competition with the dealers from his old network. He advertised and sold Sony machines at prices substantially below the list prices offered by the authorized dealers, and established a new network of sub-dealers, to whom he provided service training,

---

2. The agreement also provided that Sonam would reimburse the dealer for any replacement parts needed to fulfill the warranty obligation.

3. Paragraph FOURTH, G, required the dealer to accept complete responsibility for the repair, replacement and servicing of such of the Company's Products as the Dealer may, from time to time, be requested to repair, replace

and service by either the Company or another of its franchise dealers to the full extent required under the terms and conditions of the Company's warranties provided payment therefor is made to the Dealer of the sums set forth in the Schedule of Rates attached hereto and marked Exhibit "B" by such requesting party . . . . .

and through whom he sold Sony dictation machines.

After Williges started selling the machines purchased from ABP, Sonam began to receive complaints about this competition from its authorized dealers in Florida. In July 1974, Keith Brookins, a former Williges sub-dealer who was now Sonam's authorized dealer in Tampa, mailed letters to Sonam and to various Sony dealers across the country, enclosing copies of Williges' advertisements of Sony equipment at substantial discount prices. The letters requested "support in stopping the unethical sale of Sony dictating equipment in our area," and urged Sony dealers not to sell to Williges. Brookins also complained directly to Myron Trowbridge, Sonam's Regional Sales Manager for the Southeast, and to Leo Wyett, Sonam's General Manager for the same region; Brookins demanded that Sonam act to cut off Williges' source of supply. Sonam officials testified that their response was that Sonam could not tell its dealers to whom they could or could not sell. Brookins threatened to discontinue handling Sony products because of the competition.

In early 1975 Peter Abdo, Sonam's dealer in West Palm Beach, also started to complain about sales of Sony dictation equipment by unauthorized dealers. Brookins and Abdo each advised Trowbridge of their suspicions that ABP was providing Williges with Sony dictation machines. Trowbridge met several times with Belton Franks, president of ABP, told him of complaints of authorized dealers, and questioned Franks as to whether ABP was acting as a supplier

for Williges. Franks replied in the negative although he knew that ABP was at that time Williges' principal source of supply.

During this period, Brookins and Abdo each reported to Trowbridge the serial numbers of Sony dictation machines which they had not sold but which had been found within their territories. Sonam was unable to trace the serial numbers at that time, however, because it did not maintain the necessary records.

There are indications in the record that several other Sony dealers were complaining to Sonam about intrabrand competition in the period leading up to April 1975.[4] There are also indications that Sonam was concerned about the situation; Trowbridge discussed the dealers' complaints with Wyett in early 1975; and Michael Schulhof, who became head of Sonam's Business Products Division in February 1975, also discussed the dealers' unhappiness over unauthorized sales into their territories.

C. *The April 1975 Warranty Fee System*

In April 1975, Sonam presented its dealers with a revised dealership agreement which implemented significant changes in its warranty fee system. The provision of the prior agreements requiring a dealer to accept warranty responsibility at the request of another dealer, and upon payment of fees to him by that dealer, was eliminated. Instead the non-selling dealer was required to accept warranty responsibilities only at the request of Sonam and upon payment by Sonam.[5] A new provision was added which required the selling dealer who "failed to render" warranty service to pay

---

4. Contrary to Sonam's assertion that the record contains evidence of complaints about competition from only three Sony dealers prior to April 1975 (*see* Brief at 15), one of its officials identified four such complainers and stated that there were "possibly" "others" as well. In fact Sonam's brief identifies a fifth (*id.*), and concedes that Sonam receives frequent complaints from dealers about competition. It argues that such complaints are "indicative of healthy competition." *Id.* n.13. *See also* note 12 *infra*.

5. The new provision, ¶ FIFTH (E) required the dealer to

Accept complete responsibility for the installation, repair, replacement and servicing of such of the Company's Products as the Dealer may, from time to time, be requested to install, repair, replace and service by the Company to the full extent required under the terms and conditions of the Company's Warranties as well as the annexed Schedule of Services provided payment therefor is

the scheduled warranty fee to Sonam.[6] Contemporaneously with these changes, Sonam began to keep written records of the serial numbers of the dictation machines that it sold to each of its dealers.

There was conflicting testimony over Sonam's purpose in establishing the new warranty fee system. On the one hand, Schulhof, who had major responsibility for implementing the new system, testified that its aim was to improve service to Sony customers by ensuring that Sonam's dealers received prompt payment for servicing machines that they had not sold. The warranty fees would serve as an incentive to dealers to provide such service, and would cover the cost to the dealers of providing it. On the other hand, Clarence Aiken, a former Sony dealer in Norcross, Georgia, a suburb of Atlanta, testified that Trowbridge, Sonam's regional sales manager, had given him a different explanation of the new system. Aiken testified that Trowbridge told him not to sell dictation machines in Atlanta (outside of Aiken's territory), and said that Aiken would be charged a warranty fee for each such sale that came to light. When Aiken protested that he could provide service on any machines he would sell in Atlanta, Trowbridge was said to have replied:

> The fee would be charged nevertheless. Our attorneys have investigated this very thoroughly. We want to protect our dealer's territory, and this would be a good system for doing so.[7]

The practical effect of the new system tended to support Aiken's version. Despite the contract language indicating that non-selling dealers would take on warranty responsibility if so requested by Sonam, in practice it was the non-selling dealers, and not Sonam, who initiated warranty fee transactions under the new program. Dealers reported the serial numbers of dictation machines located within their territories which they had not sold; Sonam then traced the machines back to their sources, automatically credited the amounts of the relevant warranty fees to the accounts of the reporting dealers, and automatically debited the accounts of the dealers to whom Sonam had sold the machines. Sonam did not attempt to verify whether the selling dealer had "failed to render" service, or whether any service was actually performed by the nonselling dealer who reported the machine. Nor did Sonam inquire whether the machine reported had actually been sold, or whether it was still within the warranty period. Indeed, Sonam admits to one incident in which a Sony dealer, Bruce Tennyson of Nashville, stormed into the store of an unauthorized competitor and opened boxes on the shelves to obtain the serial numbers of the Sony dictation equipment inside. Sonam credited Tennyson with warranty fees for these machines even though it had full knowledge of the manner in which the serial numbers had been obtained,[8] and therefore knew that no service had been rendered and that the warranty period on these machines had not yet even begun.

### D. ABP's Continued Activities and Sonam's Termination of its Dealership

In mid-1975, ABP began to sell Sony dictating machines to a second independent

---

made to the Dealer of the sums set forth in said Schedule by the Company . . .

**6.** Paragraph FIFTH (D) required a dealer to provide warranty service on products sold by him and provided that

should the Dealer for any reason fail to render the aforementioned services, then and in that event the Dealer shall forthwith remit to the Company the amount set forth on the annexed Schedule of Services with respect to each Product sold by the Dealer for which the Dealer has failed to render the prescribed service.

**7.** Sonam argues that Aiken's testimony in this respect must be rejected because he gave allegedly false testimony in another respect and because this testimony was "emphatically" contradicted by that of Trowbridge. The district court was, of course, in the best position to assess the relative credibility of the various witnesses. The district judge expressly credited Aiken's testimony on this factual question, and we cannot say he was wrong to do so.

**8.** The Sony dealer was arrested for trespass; Sonam interceded on his behalf with the local prosecutor.

distributor, European Dictating Suppliers, Ltd., Inc. ("European"), of Hollywood, Florida. European resold this equipment to independent dealers, including JLM Office Products, Inc. ("JLM") in Nashville, and All Makes Dictating Machine Co. ("All Makes") in Los Angeles. These dealers in turn engaged in price cutting activities which moved authorized Sony dealers to complain to Sonam. (JLM was the unauthorized competitor whose store was raided by Sonam's dealer Tennyson.) There was testimony that ABP did not supply European or Williges with all the machines they requested during this period because of "pressure" from Sonam to reduce such sales.

Once Sonam began to keep records as to the serial numbers of the equipment sold to each of its dealers, the new warranty fee system made it obvious to Sonam that ABP was engaged in large scale wholesaling of Sony dictation equipment to dealers outside of its territory. Non-selling dealers around the country reported to Sonam large numbers of machines "found" in their territories, and Sonam's serial number records revealed that these machines had been sold by Sonam to ABP. Sonam thereupon gave the reporting dealers credits in accordance with the warranty fee schedule, and correspondingly docked ABP's account. Sonam did not inquire whether ABP intended to service these machines, and apparently had no reason to believe ABP would fail to do so; Sonam had never had a complaint from any user who had an ABP machine.

ABP refused to pay the warranty fees charged to its account. Eiberger asked Sonam to furnish proof that warranty service had in fact been rendered by the reporting dealers who had found machines sold by ABP in their territories. Sonam refused to provide such information. In February 1976, Sonam informed ABP that no further shipments of Sony equipment would be forthcoming until the fees were paid. ABP's request for additional information relating to the servicing of equipment for which it had been debited was ignored by Sonam. On April 12, 1976, Sonam informed ABP that its franchise agreement, which had expired on March 31, 1976, would not

be renewed. The only reason given was the fact that the warranty fees charged to ABP remained unpaid.

As noted above, Sony dictation equipment had amounted to roughly half of ABP's business. Eiberger considered acquiring a line of dictation equipment manufactured by one of the other leading companies. He concluded that this was not feasible, because three of those four companies had direct sales outlets in Atlanta, and the fourth had been doing business through the same dealer in Atlanta for twenty years. Thus, the termination by Sonam resulted in a total immediate loss of ABP's retail dictation machine business in Atlanta, as well as its resale business to unauthorized distributors and dealers. This suit followed.

### E. *The Decision Below*

The action was tried by the district court, sitting without a jury. The principal factual issues concerned the purpose and effect of the revised warranty fee system. ABP sought to show that this system was intended to act as a territorial restraint on sales by Sonam's dealers, for the purpose of minimizing intrabrand competition. Sonam argued, and Sonam officials testified, that the purpose of the system was to ensure that non-selling dealers who performed warranty services were promptly compensated, in order to assure service to Sony customers, and thus to enhance interbrand competition between Sony and the other leading makers of dictation equipment.

The district court rejected Sonam's explanation. While recognizing that "Sony has a right to enforce a program of warranty and installation service to the user[s] of its dictation equipment," 459 F.Supp. at 1283, the court found that the unauthorized dealers to whom ABP sold were in fact providing such service, that Sonam had not attempted to verify whether any dealers who reported serial numbers had actually provided service, and that Sonam in fact knew that some dealers receiving warranty fees had not provided service. Referring to what it characterized as a "rising tide of complaints" to Sonam from its dealers concern-

ing intrabrand competition, *id.* at 1279, the district court determined that the 1975 warranty fee system was intended to meet those complaints. The court concluded that "there was no reason for Sony to award 'warranty fees' to local dealers, unless, as was the case, these fees were levied for another purpose, to penalize dealers for extraterritorial sales for resale." *Id.* at 1283. Thus, the court found that "the primary purpose of the new warranty plan was to prevent price cutting and eliminate competition from machines sold by authorized Sony dealers for resale to others." *Id.* at 1281. The district court also found that the amounts of the warranty fees were such as to eliminate any profit from resale to dealers, and that the system had the effect of stifling intrabrand competition and maintaining retail prices at an artificially high level. Since the system, in practice, did not enhance interbrand competition but did eliminate intrabrand competition, the district court held that it was unreasonable and therefore a violation of § 1.[9]

The district court found that ABP had proven two types of economic injury resulting from Sonam's violations: (1) lost profits on sales which ABP would have made to Williges and European before the termination of ABP's dealership, had it not been for Sonam's "harassment and attempted coercion," *id.* at 1286, and (2) the reduction in value of plaintiffs' business as a going concern by reason of the termination of the Sony dealership. The total damage award, discussed in greater detail in Part III, *infra,* came to $153,416.05.

Sonam has appealed, contending that the district court erred as to the law applied, the sufficiency of the evidence and the calculation of damages.

**II**

The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce." Since the early years of this century a judicial gloss on this statutory language has established the "rule of reason" as the prevailing standard of analysis. *Standard Oil Co.* v. *United States,* 221 U.S. 1, [31 S.Ct. 502, 55 L.Ed. 619] (1911). Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.

*Continental TV, Inc.* v. *GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (hereinafter "*Sylvania*").

■ The appropriateness of rule of reason analysis in evaluating vertically imposed customer or territorial restrictions (unaccompanied by price fixing) was first established in *White Motor Co.* v. *United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), and, after a decade in which *per se* analysis was applied by many courts in the wake of *United States* v. *Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), was reaffirmed in *Sylvania, supra.*[10]

As *Sylvania* makes clear, vertically imposed territorial restrictions normally have the potential for creating, simultaneously, benefits and detriments to competition. Such restraints typically inhibit the dealers in a given brand of product from competing against other dealers in the same brand; hence intrabrand competition is reduced. But these restraints may also achieve efficiencies that stimulate competition between

---

**9.** The district court also found that "a conspiracy for the division of territories existed among the authorized Sony dealers," 459 F.Supp. at 1284, and that by joining in this conspiracy and furthering its aims through implementation of the revised warranty fee system, Sonam had committed a *per se* violation of § 1. Because we uphold the conclusion that Sonam's vertical restraints were unreasonable, we do not reach the question of whether or not there was also a *per se* violation.

**10.** *Sylvania* described the *Schwinn* decision as "an abrupt and largely unexplained departure" from *White Motor.* 433 U.S. at 47, 97 S.Ct. at 2556.

brands. As an example of such efficiencies the majority opinion in *Sylvania* cited the facilitation of a manufacturer's efforts to ensure that promised warranty services are indeed provided for its products:

> Established manufacturers can use [vertical restrictions] to induce retailers . . to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's good will and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation
>
> . . . .

433 U.S. at 55, 97 S.Ct. at 5600.

■ Sonam argues that *Sylvania* thus legitimates the practices at issue here:

> The Supreme Court's implicit approval of the GTE location clause requires the conclusion that even if Sonam's warranty fee system had incidental restrictive effects the system would pass the rule of reason test, as long as it had a valid business purpose.

(Brief at 47.) This contention is analytically, as well as factually, unsound. That a practice is not *per se* unlawful does not mean it is *per se* lawful. Thus, the fact that adequate provision of warranty services is a worthwhile goal which may increase the competitiveness of a brand and thus justify the manufacturer's imposition of vertical restraints is not, as Sonam would have it, the end of our inquiry. It is just the beginning, for we must weigh any enhancement of interbrand competition against the restrictive effect on intrabrand competition, and determine whether the restraints are, in all the circumstances, reasonable. In so doing we look to the history of the restraint itself, to the problem perceived by the manufacturer and the goal sought to be achieved, and to the actual effect of the restraint. As stated by Mr. Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918),

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*See Sylvania, supra,* 433 U.S. at 49, 57, 97 S.Ct. at 2557, 2561. *See also National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 690–92, 98 S.Ct. 1335, 1364–65, 55 L.Ed.2d 637 (1978). Within this framework, we conclude that the district court's findings amply support the conclusion that the Sonam 1975 warranty fee system unreasonably restrained trade.

■ The court made two cardinal findings. First, it found that the principal purpose of the 1975 warranty plan was not to assure that the users of Sony dictation equipment secured warranty service [11] but was rather to enforce the territorial divisions reflected in the dealership agree-

---

11. The fact that the district court found the provision of warranty services to be a subordinate purpose of the 1975 system does not validate an otherwise unreasonably restrictive operation. If it was in fact Sonam's purpose to ensure that users received needed warranty service by guaranteeing that non-selling dealers who actually performed warranty work were paid (*but see infra*), such a purpose could have been achieved with but a slight change in the pre-1975 system: the introduction of a requirement that a selling dealer pay a non-selling dealer for warranty services actually performed by the latter.

ments. Second, the court found that the effect of the new system "would be the elimination of intrabrand competition within each authorized dealer's territory." 459 F.Supp. at 1283. It would be difficult to conclude that either finding was "clearly erroneous." [12]

The evidence as to Sonam's conduct easily supports the view that Sonam intended the 1975 system to eliminate extraterritorial sales. Under the 1975 system Sonam automatically charged a dealer who sold outside of his territory with the scheduled "warranty fee" for each item so sold. The non-selling dealer had only to report the serial number of a "bootleg" (so-called by some reporting dealers) machine to Sonam; Sonam inquired no further. It did not ask the reporting dealer whether he had done any warranty work.[13] It did not ask the selling dealer whether *he* would do the warranty work. It did not ask whether the machine had yet been sold.[14] It did not ask whether the machine, if sold, was still within the 90-day warranty period.

Sonam's officials repeatedly testified that the purpose of the 1975 system was to ensure that a non-selling dealer was promptly paid for having performed warranty services.[15] Yet it is clear that Sonam knew that

---

**12.** Sonam takes issue with some of the district court's characterizations of the flow of events described in the record. For example, the district court's opinion states in part as follows:

Beginning in 1972 and continuing up until April of 1975, there was a rising tide of complaints by Sony retailers made to Michael P. Schulhof, Sony's Manager of Special Projects. These complaints centered upon the price competition offered by unauthorized Sony dealers within the territories delineated in Sony's authorized dealer's franchise agreements. As the complaints from dealers and Sony's Regional Sales Managers reached a crescendo in the spring of 1975, Sony prepared to act to eliminate the difficulties caused by the sale of Sony dictation equipment to unauthorized dealers.

459 F.Supp. at 1279. Sonam argues that there was no "rising tide" of complaints, and that those dealer complaints *which are documented* were not made to Schulhof and were not "centered upon price competition." While we may not agree with the district court's characterizations, we find no flaw in the essential facts found. There was ample evidence that both prior to and after April 1975 the dealers who competed with ABP's customers (Williges and European) felt they had a serious problem and let Sonam know about it. And there was testimony by Schulhof, as well as by Irwin Gross, National Marketing Manager of Sonam's Business Products Division, that dealers complained about sales lost to cut-price operations. *See also infra.*

Further, we note that classifying the dealer complaints as pre-April 1975 or post-April 1975 would be of far greater significance if we were reviewing the finding that Sonam implemented the new system in response to complaints and in order to further the alleged horizontal conspiracy (*see* note 9 *supra*), than it is in our actual review of Sonam's vertical imposition and administration of the April 1975 restraints.

**13.** For example, Trowbridge testified as follows:

Q When Tennyson reported to you in writing, did you ask him whether he did the warranty work?

A No.

Q Or whether he did the service work?

A No.

Q You did not know whether he had or not?

A No.

**14.** As a consequence ABP was charged warranty fees on machines that were still in the hands of the unauthorized dealers, as well as on machines that those dealers had rented to customers. The warranty period would have commenced on none of these machines.

**15.** Thus, at trial Schulhof testified as follows:

Q Did you authorize credits for Mr. Tennyson? Yes or no?

A It wasn't my procedure to authorize it. We had a procedure that was set up, and if the dealer applied for a credit prior to the fall of 1976, he gave us a serial number which we assumed he had obtained by performing some service, and it was the procedure we had in effect at some time that we would have credited his account accordingly.

THE COURT: Automatically?

THE WITNESS: If he gave us the serial number, yes. We assumed he had obtained it by actually performing some service. We felt that the payment of a warranty fee was something like an insurance premium that would insure that the dealer actually performed the services quickly and responsively, and up until the fall of 1976 we had no reason to distrust our dealers or to feel that there was any purpose other than the legitimate one for which we received the requests.

In deposition, Wyett testified similarly:

Q Did Myron tell you whether Tennyson was performing any warranty service on these machines?

A I don't recall any explicit statement to that effect, but I would have assumed that he

it was transferring warranty fees with respect to warranty work not performed.[16] It credited to Tennyson, and charged to ABP, warranty fees for machines it knew Tennyson had unearthed in JLM's store. It credited Elite Office Equipment Co. ("Elite"), its Los Angeles dealer, with some $6000 in warranty fees, which it charged to ABP, although it had been informed that Elite was paying its salesmen commissions for simply securing the serial numbers of Sony machines in Elite's territory which Elite had not sold. And when Sonam debited ABP's account and ABP inquired whether and by whom any warranty service had in fact been performed Sonam refused to give this information—for the simple reason that it had no such information.[17]

It is in part Sonam's lack of concern for who performed or would perform the warranty service that thwarts Sonam's attempt to cast ABP in the role of "the ultimate 'free rider'" (Brief at 48 n.37) envisioned by *Sylvania.* As Sonam notes, "The 'free rider' effect is the result of that situation where 'some retailers will prefer to provide no services and instead take a "free ride" on those retailers who do,'" (*id.*) quoting Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions,* 75 Colum.L.Rev. 282, 285 (1975). The problem with Sonam's con-

---

was. That was the reason he was requesting reimbursement.

Q You assumed that these people who were asking for warranty fees were actually working on these machines?

A Yes.

Q Why would you assume that?

A Because that was the basis of the program. And that, first of all, we are doing business—Sony is a company that does business on almost a family relationship. Of course, I am exaggerating [*sic*] but there is a strong feeling on our part and on the dealer's part, together we are a family and we do have mutual trust in each other. We operate accordingly. If he submitted a claim, I serviced this unit and I want warranty fees, I would accept that at its face value.

And Trowbridge testified at his deposition as follows:

Q Is there any reason why you had not asked [Tennyson whether or not he performed services (*see* note 13 *supra*)]?

A Yes. Basically, it pretty much had to be there because he identified numbers that were correct. We didn't have any reason to assume that he hadn't. Of course, we located them.

Q You assumed he did the work on the machines?

A Yes.

\* \* \* \* \* \*

Q Did [the warranty charge] apply then where he did nothing but report the serial number? Did it still receive the warranty fee?

A Yes. There was no reason to assume that he hasn't done the work. He presented a serial number. As far as we could tell it was a legitimate number.

16. Sonam's claim as to its purpose in implementing the 1975 system has proven to be a moving target. Initially its officials testified that the purpose of the 1975 system was to assure that non-selling dealers would be paid for warranty service that they had provided: these officials insisted that they had "assumed" that dealers who reported serial numbers located in their territories were thereby indicating that they had performed warranty services. *See* note 15 *supra.* In its main brief on appeal, however, Sonam challenged the relevance of the district court's findings that little or no such work had been done. Here Sonam argued that there was no need for Sonam to assure itself that its dealers had actually performed services because, contradicting the above testimony, "actual performance of work by a dealer *was not a prerequisite to payment of fees by Sonam.* Dealers were paid for *accepting the responsibility* for performing service . . ." (Brief at 41, italics in original.) Thus, a dealer who reported serial numbers, it was asserted, was assumed only to have taken on the responsibility.

Following the institution of this lawsuit, Sonam changed its warranty procedures, to require that reporting dealers provide information about the services they actually performed. Sonam says the new procedure was not caused by this litigation, but rather by the discovery that one of its dealers "had submitted fraudulent claims for warranty service." (Reply Brief at 10.) It is difficult realistically to envision a fraud capable of perpetration if, as Sonam stressed in its main brief, dealers were paid merely for accepting responsibility.

17. The district court's opinion suggested that the benefit to interbrand competition resulting from the new warranty fee system was at most "slight." Since there was no evidence that Sony dealers who received fees under the new system performed any warranty services, it is difficult to conclude that the new system enhanced interbrand competition in any way.

tention is that its factual predicates are lacking: it not only presented no evidence that the Sony dealers credited *did* provide service, it was unable to show that ABP and its distributees did *not* provide any needed service. Thus, Sonam apparently received no complaints from users as to any lack of needed service or "installation" of machines from ABP. This is not terribly surprising. Fewer than 25% of Sony's machines required any service within the 90-day period.[18] And the record shows that Williges was an experienced dealer who had provided service training to his sub-dealers, and that European's two principal customers, JLM and All Makes, did provide service on 39 of the machines they sold (on which the authorized Sony dealers in Nashville and Los Angeles were awarded warranty fees that Sonam then charged to ABP). Sonam's observation that there was no evidence of service provided on the other 255 machines that ABP sold to unauthorized dealers is hardly a telling point: there is no indication that any service for these machines was needed.

In all, Sonam's conduct was entirely consistent with the statement attributed to its regional sales manager by Aiken at trial: "We want to protect our dealer's territory, and this would be a good system for doing so." It is small wonder that many of the non-selling dealers referred to the warranty fees they requested from Sonam simply as "interterritorial commissions," for machines that "turned up," or were "found," or "lo-cated," or even "intercepted" within the requesting dealer's territory.

Nor can there be any serious doubt that intrabrand competition was in fact reduced by the introduction of the 1975 system. The district court found, and Sonam does not contest, that the amounts of the warranty fees were large enough to eliminate any profit that a dealer would make on sales to unauthorized dealers for resale.[19] Indeed, the amounts of these fees far exceeded ABP's gross profit on sales to Williges and to European. The natural tendency of the system would therefore be to discourage extraterritorial sales in competition with other Sony dealers. Sonam's argument that its new system actually *encouraged* intrabrand competition, by providing Sony dealers a mechanism by which to ensure that warranty service would be available to their customers in other areas, would have us ignore the nature of the old system, which in fact encouraged interterritorial competition to a far greater extent. Under the pre-1975 system the seller had only to make a request and pay the applicable warranty fee, and the non-selling dealer was thereby required to take complete responsibility for providing warranty service.[20] The changes made in 1975 thus did not increase the non-selling dealer's obligation to provide service.[21] Their effect was in quite another direction: whereas prior to 1975 the warranty fee transfer occurred at the instigation of the selling dealer, who could avoid paying the fee by standing

---

**18.** Two Sonam witnesses testified that they made free "service calls" within the warranty period in connection with 25% of the machines they sold, although one of these dealers noted that the machines in question often did not need service, in that they had not broken down or malfunctioned. Eiberger testified that no more than one percent of the Sony machines required service within the first 90 days after sale.

**19.** It appears that these scheduled amounts (which ranged from $40 to a total of $110) are substantially the same as the amounts scheduled in the pre-1975 system. The difference in impact lies in the fact that the April 1975 plan deprived the selling dealer of control over the incidence of his payment of such fees and exposed all of his sales to them.

**20.** We agree with Sonam that the district court was in error when it stated that

> [b]efore the change, . . . [n]o payment was made by an extraterritorial dealer without first receiving reasonable assurance from the local dealer that the claimed services actually were rendered to the user. . . .

459 F.Supp. at 1279–80. However, we do not consider the error material. The fact remains that before April 1975 the extraterritorial seller had the option of performing any needed warranty services himself and saving the fee. The April 1975 system deprived him of this option.

**21.** *Compare* note 3 *supra with* note 5 *supra.*

ready to perform any needed warranty service himself,[22] the 1975 change forced that seller to pay the fee despite his readiness to perform any needed service. We can hardly regard this change as *pro*competitive.

The district court concluded that an effect of the 1975 system's elimination of intrabrand competition was to "result further in the price of Sony dictation equipment within any given territory being kept at an artificially high level." 459 F.Supp. at 1283. Sonam contends that there is "absolutely no evidentiary support" for such a finding. While there may be little direct evidence as to the artificiality of the prices at which Sony dealers sold, there is considerable support for the view that their prices were substantially higher than the prices offered by their unauthorized competitors, and some indication that sales were made at prices higher than those of competing models of other brands. The clear weight of the evidence is that Sonam's dealers generally tried to avoid selling below list price. One dealer writing to Sonam to explain its own extraterritorial sale of certain Sony equipment, pointed out that it had been able to make the sale "at full list price with no discounts in any manner shape or form." He further stated that he had achieved this despite "stiff competition" from Lanier (the number three company in the market) and Dictaphone (the number one company), and despite Lanier's offer of a lower price. Some Sony dealers managed to sell at prices substantially above the suggested list price. There is evidence that Elite, Sonam's Los Angeles dealer, normally sold for $470 machines whose list price was $425, whereas All Makes offered those machines at list price. And Sonam's dealers frequently complained about low discount prices of unauthorized dealers. Thus, Elite reported to Sonam that someone other than All Makes was selling machines at a 35% discount. Tennyson complained that he had lost sales because JLM offered a lower price. Williges

and European routinely advertised Sony products at discounts of 20–25% below Sonam's suggested list prices; Brookins, Sonam's dealer in Tampa, complained to Sonam that he had lost out to Williges on some competitive bids for Sony equipment, and threatened to discontinue the Sony line. He also sent letters to Sony dealers from coast to coast, enclosing copies of Williges' ads and asking help in stopping Williges' so-called "unethical" sales of Sony equipment. Sonam's national marketing manager for business products testified that Sonam got "communications constantly from dealers complaining about competition, how stiff it is, about price cutting." The natural tendency of this price competition would have been to exert downward pressure on price levels. By eliminating the source of the price competition, the new warranty fee system removed the downward pressure.

Two legal theories by Sonam deserve brief mention. First, Sonam contends that its status as a "new entrant in the dictation machine market" makes its 1975 warranty system reasonable. The district court properly rejected this argument. In 1975, when the new warranty fee program was implemented, Sonam's share of that market was 12%; Sonam and four other makers accounted for 96% of sales. A Sonam handbook reflecting these figures stated that

> SONY, in overall equipment sales, ranks number five in the list today, but SONY is the fastest growing of all [input word processing equipment] companies and grew to the number five position among twenty suppliers in less than four years. SONY is one of the fastest growing companies to experience major growth during the 70's. And we expect that trend to continue with your increased sales this year.

Thus, as the Sonam handbook also states, "In the short time that SONY has been in the marketplace—only since 1971—SONY has been a leader."[23] Sonam's strong mar-

---

**22.** Aiken, for example, wanted to sell machines in Atlanta, which was some 20 miles from his office. He saw no reason why he could not provide any needed service.

**23.** We note also the lack of parallel this creates with *Sylvania*: whereas Sonam had 12% and was "fastest growing," Sylvania had 1–2% of its market and was declining. *See Sylvania*

ket position completely undercuts any argument for leniency based on its "new entrant" status.

Finally, Sonam argues that in order to make out a violation of § 1, ABP must show that Sonam's anticompetitive activities had some impact on the dictation machine market as a whole. Sonam's argument is based entirely on certain language in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), and *Daniels v. All Steel Equip. Inc.*, 590 F.2d 111, 113 (5th Cir. 1979), to the effect that a conspiracy to eliminate one dealer of a given product line does not violate § 1 (despite the inevitable reduction of intrabrand competition) unless there is an anticompetitive effect in the industry as a whole. However, Sonam has taken this language out of context; *Oreck* and *Daniels* are of little relevance to the present case. In both of those cases the only conduct alleged to be a violation was the termination itself. Each termination was effected pursuant to provisions of a dealership contract which contained no restraints that were challenged as unreasonable. Our holding in *Oreck* was premised simply on our conclusion that

> it is inconsistent with the sanctity of contractual arrangements to allow the antitrust laws to inject a provision into the agreement which would require Whirlpool to renew Oreck's distributorship for as long as it is able to compete successfully with [Whirlpool's other customer].

579 F.2d at 133. In the present case, by contrast, the violation consists initially of Sonam's implementation and operation of its 1975 warranty fee system; ABP's dealership was terminated because ABP refused to pay charges assessed to it under that unlawful system. Unless we are to conclude that an anticompetitive impact on intrabrand competition cannot alone support a finding that § 1 has been violated—and we see no basis for such a conclusion, see *Sylvania, supra*, 433 U.S. at 49, 57 n.27, 97 S.Ct. at 2557, 2561 n.27—we must conclude that ABP has proven such a violation here.

The district court correctly determined that Sonam's 1975 warranty fee system was an unreasonable restraint of trade, and that it therefore violated § 1. Accordingly, we turn to the question of damages.

### III

■ The district court ruled that ABP was entitled to compensation for two categories of injury—lost profits on sales that were prevented prior to the termination of its Sony dealership, and the reduction in the value of ABP's business resulting from the termination. The court computed damages of $21,046 in the first category and $31,822 in the second category. The damage award of $153,416.05 was arrived at by adding the two categories, trebling, and deducting from the total $5187.95 awarded to Sonam on its counterclaim.[24] Sonam challenges the award in several respects. It contends principally that the court erred in (1) finding that profits had been lost, (2) calculating the amount of such lost profits, and (3) basing its projection of future profits, for purposes of calculating the reduction in value of ABP's business resulting from the termination, on ABP's performance for the single year immediately prior to the termination, rather than on the entire three-year period during which ABP was an authorized Sony dealer.[25] We reject the first and third

---

*supra*, 433 U.S. at 38, 97 S.Ct. at 2551. Further, Sylvania was competing in a market dominated by RCA which had 60–70% of the market. *Id.* Here, no one firm dominated. The 1975 rankings were:

| | |
|---|---|
| Dictaphone | 24.50% |
| Norelco | 23.88% |
| Lanier | 23.00% |
| IBM | 12.47% |
| Sonam | 11.97% |

**24.** The amount deducted reflects the parties' stipulation as to the amount Sonam was entitled to recover on that part of its counterclaim which sought recovery for equipment shipped to ABP for which ABP never paid Sonam. The district court ruled against Sonam on so much of its counterclaim as sought to collect from ABP unpaid warranty fees in the amount of $5,140.

**25.** Although it is unclear, Sonam may also be arguing that the district court erred when it included in the one-year base period figures an

of these contentions but find some merit in the second.

Sonam's contention that ABP did not lose any sales to Williges and European as a result of Sonam's restrictions is not borne out by the evidence. Williges testified that he did not receive all the Sony machines he ordered from ABP. Milton Ferguson of All Makes testified that All Makes was unable to get delivery of all the Sony machines it ordered from ABP's customer European, and was forced to seek needed machines elsewhere. It was undisputed that dealers put pressure on Sonam to prevent sales to Williges, and that Sonam repeatedly quizzed ABP's president as to ABP sales to Williges. Franks testified that Eiberger told him that because of this "pressure," Franks should "go slow" on extraterritorial sales. We cannot say that the district court's finding that ABP lost some profits as a result of Sonam's actions was clearly erroneous.

The same standard governs our review of the district court's calculations of lost profits on future sales. The district court based its projections of future sales to users on ABP's experience during the 12-month period immediately prior to its termination. Sonam argues here, as it did below, that these projections should be based on the entire 39-month period during which ABP was an authorized dealer. The court observed that ABP had sustained large losses on its Sony operation during the October 1973–September 1974 period, which the record indicates may have resulted from certain large non-recurring expenses, but that for the next 18 months, i. e., until its termination, ABP's Sony operation was profitable. The court also noted that "the Sony business was a new business in a market evidencing increasing demand for the prod-

uct." 459 F.Supp. at 1289. As a result, the district court concluded that use of the 39-month base period urged by Sonam would "underestimate the true value of ABP's Sony business." Id. at 1288. The question of which approach is proper is essentially a factual one, see Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566–67 (2d Cir. 1970), and "each case of valuation must ultimately rest on its own facts." Vandervelde v. Put & Call Brokers & Dealers Ass'n, 344 F.Supp. 118, 151 (S.D.N.Y.1972). Accordingly, the only issue before this Court on appeal is whether the trial court's findings are clearly erroneous. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). Other courts in other cases have indeed taken different approaches to the problem of projecting future business trends, but on the record before us we conclude that the base period chosen by the district court was not unreasonable, and we therefore decline to disturb it.

Certain of the district court's calculations of the amount of lost profits, however, lack support in the record. Williges testified that if ABP had sold him all the machines he requested, he would have purchased 60–100 machines per month. Williges was an experienced dealer who was thoroughly familiar with his market, the state of Florida. His estimate was based on his past experience in that market and on the growing demand for Sony dictation machines there. The district court credited Williges' testimony, and relied also on evidence that Sonam's authorized dealers experienced large increases in sales when Williges started to encounter difficulties in obtaining machines from ABP. We conclude, on the basis of the foregoing, that the district court's finding that ABP would have sold 60 machines

---

amount for profits that ABP would have earned on sales lost as a result of Sonam's intimidation. Such an argument is clearly incorrect. ABP is entitled to an award that covers all of the profits it would have earned but for Sonam's violation: these include both the profits lost while ABP was still an authorized dealer, and the profits it would have earned after that point, which when capitalized equal "going concern" value of the lost portion of ABP's

business. See Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d 61, 80–82 (1st Cir. 1970). To exclude lost profits from the base period figures used to project the latter component would be to reduce plaintiff's award for the later period precisely because defendant's intimidation had been successful in the base period. Such a reduction would obviously be improper.

per month to Williges is not clearly erroneous.

We cannot say the same of the court's finding that ABP would have sold 100 machines per month to European. Barry Roth, European's president, testified as to how many machines European would have purchased from ABP. However, the district court specifically rejected Roth's estimate, and relied solely on the testimony of European's two customers, Jerry McCloud of JLM and Milton Ferguson of All Makes. McCloud estimated that he could have purchased 28–40 machines per month, and Ferguson apparently made no estimate at all. Thus, while Ferguson's testimony supports a finding that profits were lost, it does not serve to quantify the loss. Even if, as appears, demand was rising and JLM and All Makes were underselling their competitors, the district court's estimate concerning purchases by European (at least beyond the 28–40 machine figure provided by McCloud) appears to have been too speculative to support an award of damages. *See Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). On remand the district court should reconsider this issue and recalculate the damages award accordingly, and may make such other adjustments to that award as it deems necessary.[26]

We affirm the district court's ruling on liability on the grounds stated above, reverse on the question of damages, and remand for further proceedings not inconsistent with this opinion. No costs.

---

**26.** For purposes of calculating damages, the court used the actual historical figures for ABP's gross profit percentage on sales made to European (9.19%), its gross profit percentage on sales made to Williges (5.44%), and the average price of the machines ABP sold to these dealers ($222). On the basis of these assumptions, and after deducting 20% of gross profits to cover incidental expenses, the court concluded that ABP would have earned $6,355 on lost sales to Williges, and $14,691 on lost sales to European, for a total of $21,046.

In estimating the value of ABP's business the court first determined to use the twelve-month period immediately prior to termination of the dealership as the base period for purposes of capitalizing earnings. Taking the actual profit on retail sales to users for that period ($14,-865), and its finding as to lost profit on the thwarted sales ($21,046), the court found prof-its of $35,911 for the twelve-month period. The court capitalized these earnings at a rate of 50%, and subtracted $40,000 to account for tangible assets which ABP retained after the termination, to arrive at a figure of $31,822 for reduction in going concern value by reason of the termination. Obviously the inflated finding of lost profits inflated the finding as to reduction in the value of ABP's business.

In addition, we note that the parties have argued at some length over what they characterize as "mechanical" errors in the district court's damages calculations. These do not appear to be merely arithmetical steps, but rather go to the method of valuing plaintiff's business; we are not sure that the district court would consider them errors at all. These matters should be dealt with in the first instance by the district court and may be considered on remand.