[No. B175179. Second Dist., Div. Two. July 28, 2005.]

PEOPLE'S CHOICE WIRELESS, INC., et al., Plaintiffs and Appellants, v. VERIZON WIRELESS, Defendant and Respondent.

658

## COUNSEL

Blecher & Collins, Maxwell M. Blecher and Matthew E. Hess for Plaintiffs and Appellants.

Overland Borenstein Scheper & Kim, Diann H. Kim and Wendy O. Clendening for Defendant and Respondent.

## OPINION

**ASHMANN-GERST, J.**—Appellants People's Choice Wireless, Inc., and Cellular Depot, Inc., sued respondent Verizon Wireless (Verizon) for unfair competition pursuant to Business and Professions Code section 17203[1] on behalf of themselves and similarly situated independent dealers of cellular telephones (collectively, the Independent Dealers). In their first amended complaint (the complaint), the Independent Dealers alleged that Verizon engaged in unfair competition by: (1) refusing to sell popular new cellular

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated. Section 17203 provides, in relevant part: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

telephone models to the Independent Dealers during an extended holdback period; and (2) selling cellular telephones to customers below cost in certain circumstances when the Independent Dealers could not afford to compete. According to the Independent Dealers, the trial court erred when it sustained Verizon's demurrer without leave to amend. We have reviewed the complaint and the law and find no error.

We affirm.

## FACTS

*The Complaint*

The Independent Dealers alleged: Because cellular telephones are expensive, service providers such as Verizon sell them below cost if a consumer agrees to purchase telephone service for a set period of time, usually one to three years. Similarly, service providers often subsidize the cost if a customer wishes to upgrade to a new cellular telephone. Verizon sells cellular telephones through its wholly owned retail stores and retail stores operated by the Independent Dealers.

At Verizon's request, companies such as Motorola, Nokia and Sony manufacture cellular telephone models that are solely compatible with Verizon's telephone network. The manufacturers agree to sell new models to Verizon on an exclusive basis for a specified period of time, normally three to six months (the exclusive period). During the exclusive period, the Independent Dealers cannot purchase new models from the manufacturers, but they can purchase new models directly from Verizon. Most consumer sales occur within the exclusive period during the first one to two months of when a new model is released.

The Independent Dealers match the prices being charged for cellular telephones in the Verizon stores. Above and beyond that, the Independent Dealers provide customers who purchase a cellular telephone with several useful accessories, such as headsets or carrying cases, at no additional cost. If a customer wanted to purchase these same accessories at a Verizon store, the customer would have to pay extra. By providing free accessories to their customers, the Independent Dealers undercut Verizon's prices and create price competition.

*Count I*

In the past, within the exclusive period, Verizon imposed a two-week holdback period on its most popular new cellular telephones models. During

this holdback period, Verizon released its most popular new models to Verizon's retail stores but not to the Independent Dealers. As a result, the Independent Dealers could not sell the most popular new models of Verizon's cellular telephones for the first two weeks of their release. Then, when the Motorola T720 was released for sale, Verizon extended the holdback period to two months. For the Blackberry 6750, Verizon extended the holdback for a period of time that exceeded four months and was continuing as of the date the complaint was filed. Verizon claims that the holdback period is necessary for quality control. The true purpose is to ensure that Verizon's retail stores obtain the majority of sales for popular new models. Verizon heavily advertises the availability of popular new models during the holdback period. Once the holdback period ends, Verizon's advertising ceases almost entirely. The Independent Dealers depend on new model sales for a majority of their income and are adversely impacted by the holdback period. Moreover, if they were given access to the models subject to the holdback period on the same terms as the Verizon stores, they would match Verizon's prices, offer free accessories and undercut Verizon's prices. As a practical matter, the holdback period prevents price competition and is therefore violative of section 17200 et seq.

*Count II*

Until recently, Verizon's commission structure placed the Independent Dealers on an equal footing with Verizon's wholly owned retail stores. Verizon subsidized the cost of new cellular telephones only for those customers who had fulfilled at least one year of their service contract. On a parallel basis, Verizon's authorized wholesale distributors paid a commission to the Independent Dealers whenever they obtained service contract renewals from customers who had fulfilled at least one year of their existing service contract. The Independent Dealers were able to use their service contract renewal commissions to partially offset the cost of new cellular telephones and then price those new models to match the prices being charged for the same models in Verizon's stores. In December 2002, Verizon began subsidizing all new cellular telephone sales, even sales to customers who had not fulfilled a least one year of their service contract. Verizon did not, however, change its commission structure for the Independent Dealers. Without commissions on sales to customers who fulfilled less than one year of their service contracts, the Independent Dealers cannot subsidize the cost of new cellular telephones to those customers. Verizon's commission structure reduces intrabrand competition, discriminates against the Independent Dealers, and amounts to unfair competition.

*The Demurrer and This Appeal*

Verizon demurred to the complaint on the grounds, inter alia, that the allegations did not satisfy the test set forth by *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*). The trial court sustained the demurrer without leave to amend and the Independent Dealers noticed this appeal. Because there was no judgment, the clerk of the Court of Appeal informed the Independent Dealers that the Court of Appeal lacked jurisdiction. Thereafter, in order to perfect appellate jurisdiction, the parties stipulated that the action was dismissed and judgment entered in favor of Verizon. The stipulation was filed and the trial court ordered that it be given legal effect.

## STANDARD OF REVIEW

■ When a complaint has been disposed of via demurrer, our review is de novo. In other words, " ' "[w]e treat [a] demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

## DISCUSSION

1. *The holdback period.*

■ According to the Independent Dealers, the allegations in count I of the complaint satisfy two of the three possible grounds for finding conduct between competitors to be considered unfair pursuant to our Supreme Court's opinion in *Cel-Tech*. We are unable to concur with this assessment. As we shall discuss below, the allegations fail to demonstrate either that Verizon's conduct (1) violates the policy or spirit of the antitrust laws because the effect of the conduct is comparable to or the same as a violation of the antitrust laws, or (2) it otherwise significantly threatens or harms competition. (*Cel-Tech, supra*, 20 Cal.4th at p. 187.)[2] While expediting our duties, we have kept the following principle uppermost in our reasoning. "Injury to a competitor is not

---

[2] The third *Cel-Tech* ground is that the conduct threatens an incipient violation of the antitrust laws. We need not analyze this ground. The Independent Dealers freely admit that this is not an antitrust case under federal law or section 16720 et seq. (the Cartwright Act).

equivalent to injury to competition; only the latter is the proper focus of antitrust laws. [Citations.]" (*Cel-Tech, supra,* 20 Cal.4th at p. 186.)

a. *Violation of antitrust policies.*

To kick off their argument, the Independent Dealers solicit a comparison of this case to a refusal-to-deal case, *Eastman Kodak Co. v. Image Technical Services, Inc.* (1992) 504 U.S. 451 [119 L.Ed.2d 265, 112 S.Ct. 2072] (*Eastman Kodak*). Verizon parries with the contention that, with few exceptions, a company owes no duty to help anyone and is free to deal or not deal with a competitive rival.

Indeed, Verizon is on target with the general rule. Nearly a century ago, the Supreme Court recognized that, subject to antitrust laws such as the Sherman Act,[3] there is a "long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (*United States v. Colgate & Company* (1919) 250 U.S. 300, 307 [63 L.Ed. 992, 39 S.Ct. 465, 1919 Dec.Comm'rPat. 460] (*Colgate*).) That theme has continued life. (See *Dimidowich v. Bell & Howell* (9th Cir. 1986) 803 F.2d 1473, 1478 [stating that a "manufacturer may choose those with whom it wishes to deal and unilaterally may refuse to deal with a distributor or customer for business reasons without running afoul of the antitrust laws"].)

Recently, we were treated to the Supreme Court's scholarship on the matter when it revisited *Colgate* and the Sherman Act to once again place its intellectual brackets on our land's antitrust law. (See *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (2004) 540 U.S. 398, 408 [157 L.Ed.2d 823, 124 S.Ct. 872] (*Verizon Communications*).) The Supreme Court explained that the "opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." (*Id.* at p. 407.) Diligent companies, of course, are in a position to gain monopoly power by building an infrastructure that allows them to excel in business. Upon noting this market reality, the court segued into the following observation: "Compelling such [companies] to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." (*Id.* at pp. 407–408.) For this reason, the general rule expressed in *Colgate* remains a major policy point.

---

[3] Title 15 United States Code section 1 et seq.

By the same token, the *Verizon Communications* court explained that refusal to deal is not an unqualified right. (*Verizon Communications, supra,* 540 U.S. at p. 408.) Still, the court has "been very cautious in recognizing . . . exceptions [to *Colgate*], because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single [company]." (*Ibid.*) In the view of the Supreme Court, the leading case for liability based on refusal to deal is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* (1985) 472 U.S. 585 [86 L.Ed.2d 467, 105 S.Ct. 2847] (*Aspen Skiing*), a cased cited in the Independent Dealers' briefs. In *Aspen Skiing*, there was a ski locale comprised of four mountain areas. The defendant owned three of those areas, and the plaintiff owned one. For years, they cooperated by issuing joint, multiple-day, all-area ski tickets. When the plaintiff refused to give the defendant a greater share of the proceeds, the defendant canceled the joint tickets. The plaintiff tried unsuccessfully to recreate the joint tickets, even offering to buy the defendant's tickets at retail price. The Supreme Court upheld the jury's verdict in favor of the plaintiff, concluding that the jury may well have found that the defendant was more interested in reducing competition than obtaining the short-run benefits of the joint tickets. (*Verizon Communications, supra,* 540 U.S. at pp. 408–409.) But the *Verizon Communications* court highlighted the fact that *Aspen Skiing* "is at or near the outer boundary of [title 15 United States Code section] 2 liability." (*Verizon Communications, supra,* 540 U.S. at p. 409.)

Now that we are done with our preliminaries, we bring *Eastman Kodak* to the fore. The book on that case goes like this. Kodak was in the business of providing service and parts for its office equipment to its customers. It produced some of the parts itself, and the rest were made to order by independent original-equipment manufacturers (OEM's). In the early 1980's, independent service organizations (ISO's) started repairing and servicing Kodak equipment. As well, they sold parts and reconditioned Kodak machines. Soon thereafter, Kodak adopted a policy of limiting the availability of parts to the ISO's. It sold replacement parts for micrographic and copying machines only to buyers of Kodak equipment who also purchased service from Kodak for any repair of those machines. There were a variety of corollaries. Kodak and the OEM's agreed that the OEM's would not sell parts to anyone but Kodak. Through pressure, Kodak convinced Kodak equipment owners and independent parts distributors to stop selling Kodak parts to the ISO's. Last, Kodak implemented a plan to prevent others from obtaining used Kodak machines. The intent behind Kodak's machinations regarding parts was to inhibit the ISO's ability to sell service for Kodak machines. (*Eastman Kodak, supra,* 504 U.S. at pp. 455–459.)

The ISO's sued under the Sherman Act, claiming that Kodak had unlawfully tied the sale of service for Kodak machines to the sale of parts, in

violation of title 15 United States Code section 1, and had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines, in violation of title 15 United States Code section 2.[4] (*Eastman Kodak, supra*, 504 U.S. at p. 459.) The district court granted summary judgment for Kodak, and the matter was reversed on appeal.

■ Because the Independent Dealers do not allege a tying agreement, we focus on the portion of *Eastman Kodak* that discusses section 2 of the Sherman Act. In affirming the reversal, the Supreme Court noted that the " 'offense of monopoly under [section] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' [Citation.]" (*Eastman Kodak, supra*, 504 U.S. at p. 481.) The fact that Kodak controlled nearly 100 percent of the parts market and 80 percent to 95 percent of the service market, with no readily available substitutes, was sufficient to suggest the existence of monopoly power. Kodak complained that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. The court disagreed. "The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. [Citation.] Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. [Citation.] This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market. [Citations.] The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers. [Citation.]" (*Eastman Kodak, supra*, at pp. 481–482, fns. omitted.) In a footnote, the court explained that *United States v. Du Pont & Co.* (1956) 351 U.S. 377 [100 L.Ed. 1264, 76 S.Ct. 994], did not foreclose single brands from being a market. Rather, it merely held that "one brand does not *necessarily* constitute a relevant market if substitutes are available. [Citations.]" (*Eastman Kodak, supra*, at p. 482, fn. 30.)

With respect to the second element, which required "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor,' " the court stated that there was a triable issue if

---

[4] Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." (15 U.S.C. § 2.)

"Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power." (*Eastman Kodak, supra,* 504 U.S. at pp. 482–483.) Though Kodak offered justifications for its exclusionary policy, the court found triable issues as to whether the justifications were valid and sufficient. (*Id.* at p. 483.)

On remand, the jury found for the ISO's on the title 15 United States Code section 2 claim. The Ninth Circuit affirmed in *Image Tech. Services, Inc. v. Eastman Kodak Co.* (9th Cir. 1997) 125 F.3d 1195 (*Image Tech*). In doing so, the court detailed the "substantial evidence" that supported the jury's finding that Kodak used its monopoly over parts in order to gain a monopoly over the service of Kodak equipment. (*Id.* at p. 1208.) The court elucidated the controlling law thusly: "Section 2 of the Sherman Act prohibits a monopolist's unilateral action, like Kodak's refusal to deal, if that conduct harms the competitive process in the absence of a legitimate business justification. [Citations.]" (*Image Tech, supra,* at p. 1209.)

Jumping into the appellate fray, the Independent Dealers aver that the facts alleged in the complaint are "strikingly similar" to those in *Eastman Kodak* and *Image Tech* because: (1) the ISO's were forced to purchase all of their replacement parts from Kodak, and the Independent Dealers were forced to purchase new Verizon cellular telephones from Verizon; and (2) like Kodak, which willingly sold replacement parts to the ISO's and then stopped, Verizon always had a two-week holdback period and then suddenly and unfairly lengthened that period.

To be frank, a skepticism was born with this forced analogy. The two cases are decidedly *dissimilar*. The relevant market in *Eastman Kodak* was defined by a single brand of service, i.e., it was composed of companies that serviced Kodak machines because there were no available substitutes. Kodak had a monopoly in the parts market and used it to monopolize the service market. In contrast, the relevant market here is comprised of *all* cellular telephones, and there is no allegation that Verizon has monopolized that market, or any related market. Customers change service providers, options, calling plans and cellular telephones on a regular basis. There are service providers other than Verizon, such as T-Mobile and Cingular, and there are manufacturers, such as Motorola, Nokia and Sony, which all sell cellular telephones. Moreover, the Independent Dealers do not claim that they, like the ISO's, have been permanently cut off from a whole brand of products, or that consumers will be forced to purchase cellular telephones only from Verizon. Rather, they merely contend that they are denied the ability to sell the most popular new Verizon models, only two of which are identified by the complaint, for a finite period of time. It can be inferred from the complaint that their ability to sell other brands is unfettered, and consumers still have a wide variety of

choices of what and where to buy. Finally, whereas competition in the relevant market in *Eastman Kodak* was diminished, there is no equivalent allegation here. The Independent Dealers complain about the diminution of "intrabrand" price competition, rather than the diminution of market competition. In other words, all they can say is that there is less price competition for Verizon's cellular telephones, not that there is less price competition among all the different cellular telephone brands. Given this, it cannot be said that the effect of Verizon's conduct is comparable to or the same as a violation of the antitrust laws. In fact, a logical deduction from the complaint is that even though the Independent Dealers cannot undercut Verizon's prices on popular new Verizon cellular telephone models during the holdback period, they can still undercut Verizon's prices with respect to the competing brand models acquired from manufacturers and other service providers.

In essence, the Independent Dealers want to force Verizon to immediately release its most popular new models and thereby "share the source of [its] advantage." (*Verizon Communications, supra*, 540 U.S. at p. 407.) But, unless there is an exception, the right to refuse to deal remains sacrosanct. Because that is true, the mere refusal to deal does not violate the spirit or policy of antitrust law. In the absence of an abuse of monopoly power in a relevant market, this case involves nothing more than a permissible refusal to deal with the Independent Dealers.

Boiled down, the Independent Dealers' position is that the trial court failed to properly balance *Colgate* against other antitrust policies. In their reply brief, the Independent Dealers advert to the following Supreme Court quote: " 'Congress designed the Sherman Act as a "consumer welfare prescription." ' [Citation.] A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of anti-trust law. Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit. [Citation.]" (*NCAA v. Board of Regents of Univ. of Okla.* (1984) 468 U.S. 85, 107–108 [82 L.Ed.2d 70, 104 S.Ct. 2948], fn. omitted.) Using this language as a springboard, the Independent Dealers declare that price competition is "the single most important public policy goal furthered by the antitrust laws." What the Independent Dealers fail to appreciate is that antitrust policy attempts to balance the benefits of protecting and fostering economic incentives for entrepreneurs to pursue business with the benefits procured for consumers when courts manage markets. In our view, the trial court found the right balance when it sustained Verizon's demurrer without leave to amend. Because we are dealing with a limited time restriction on *some* cellular telephones of *one* of many brands in a vibrant, volatile market with many consumer options, we take special heed of the warning in *Verizon Communications* that we should be cautious before creating exceptions to the conduct allowed by *Colgate*.

It is true, as the Independent Dealers take pains to stress, that *Cel-Tech* does not require an antitrust violation in order to state a section 17203 claim. But we must still look at the alleged impact of the conduct, and we must consider any countervailing policies. The allegations here are simply too far removed from cognizable antitrust evils to warrant intervention by a California court.

### b. *Significant threat or harm to competition.*

The Independent Dealers' argument regarding the threat or harm to competition is set forth in the following three sentences: "Here, Verizon's conduct indisputably reduces both consumer choice and price competition. It reduces consumer choice by choking off one of the avenues of distribution of Verizon's products. More significantly, it prevents [the Independent Dealers] from selling [cellular] telephones at a discount." After parsing this argument, we find it lacking.

We do not perceive a threat or harm to competition which can be characterized as significant. As explained in part 1.a., *ante*, there may be a reduction in intrabrand competition regarding some Verizon cellular telephones for short periods of time, but there is no reduction in interbrand competition. The continuing interbrand competition from manufacturers and other service providers offers consumers a healthy array of choices and the benefit of price competition. What shines through most clearly in the complaint is that Verizon's conduct has injured the Independent Dealers. But, as *Cel-Tech* teaches, injury to competitors is not the same thing as injury to competition, and we may only consider the latter.

## 2. *The commission structure.*

Count II fails to state a claim under section 17203.

In part, the problem is that the meaning of count II is murky. In their prayer for relief in the complaint, the Independent Dealers requested an "injunction prohibiting Verizon from permitting customers to upgrade their [cellular telephones] at Verizon owned stores if they have not fulfilled at least one year of their service contract, which injunction shall continue in force unless and until Verizon adjusts its commission structure in such a manner as to permit [the] Independent Dealers to subsidize the [cellular telephone] purchases of those customers who have not fulfilled at least one year of their service contract."

Essentially, the Independent Dealers paint the following picture. In the past, when a Verizon customer wanted a new cellular telephone, Verizon

would sell that cellular telephone below cost if the customer had fulfilled a year of his or her existing service contract. The only way the Independent Dealers could compete was to get a customer who had fulfilled a year of his or her existing service contract to renew that contract and then use the commission from that renewal to offset the cost of the new cellular telephone. When Verizon began selling all new cellular telephones below cost, the Independent Dealers were unable to compete in situations in which they did not receive a renewal commission. To remedy this situation, the Independent Dealers want a court to prohibit customers from upgrading their cellular telephones at Verizon stores until after they fulfill at least a year of their service contracts. Oddly, this would make it unlawful for Verizon to sell cellular telephones to some of their own customers. Also, it would mean that those customers could only get upgrades through the Independent Dealers or the manufacturers. According to the Independent Dealers, this injunction should last until such time as Verizon devises a commission structure that allows the Independent Dealers to sell Verizon cellular telephones below cost to all customers, not just those who have fulfilled a year of their service contracts.

The bottom line is the Independent Dealers want to prevent Verizon from discounting in situations where they themselves cannot discount. This means that if the Independent Dealers cannot share in the wealth, they want a court to force certain Verizon customers to pay *higher* prices. What antitrust policy would be at play here? The Independent Dealers do not say, and it is difficult for us to conceive. A few things must be sorted out before we even try.

■  It is important to note that the policies behind section 1 of the Sherman Act are not implicated here.[5] (15 U.S.C. § 1.) We have been instructed by the Supreme Court that section 1 of the Sherman Act "reaches unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between *separate* entities. It does not reach conduct that is 'wholly unilateral.' [Citations.]" (*Copperweld Corp. v. Independence Tube Corp.* (1984) 467 U.S. 752, 768 [81 L.Ed.2d 628, 104 S.Ct. 2731] (*Copperweld*).) A parent and its wholly owned subsidiaries, like Verizon and its stores, are considered a single economic entity for purposes of the Sherman Act. (*Copperweld, supra,* at pp. 771–774.)

Now to the bone of contention.

---

[5] Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." (15 U.S.C. § 1.)

To establish the validity of count II, the Independent Dealers contend that Verizon's commission structure produces an effect comparable to or the same as that in *Eiberger v. Sony Corp. of America* (2d Cir. 1980) 622 F.2d 1068 (*Eiberger*), and therefore triggers *Cel-Tech*. We disagree.

In *Eiberger*, the question was whether Sony Corporation of America (Sony) had violated section 1 of the Sherman Act. (*Eiberger, supra*, 622 F.2d at p. 1070.) The background facts were these. Eiberger's company (ABP) was a nonexclusive dealer of Sony dictation machines in the Atlanta, Georgia territory. ABP eventually began to sell large quantities of dictation machines to discounters who undersold to authorized dealers in other territories. Subsequently, Sony revised its dealership agreements. Nonselling dealers were required to accept warranty responsibilities on dictation machines when requested and paid by Sony. Additionally, if the selling dealer did not render warranty service, then it had to pay a scheduled warranty fee to Sony. Nonselling dealers began finding machines sold by others in their territories and reporting the serial numbers of those machines to Sony. Sony credited the accounts of those dealers with warranty fees and debited a corresponding amount to the accounts of the selling dealers. Sony did so whether or not warranty service had been rendered and regardless of whether the warranty period had begun. When Sony began docking ABP's account, ABP refused to pay. As a result, Sony elected not to renew ABP's franchise. (*Id.* at pp. 1071–1074.)

The district court found that Sony's warranty fee requirement amounted to a vertical territorial restriction on trade, and that it was unlawful. As the *Eiberger* court explained, the reality is that "vertically imposed territorial restrictions normally have the potential for creating, simultaneously, benefits and detriments to competition. Such restraints typically inhibit the dealers in a given brand of product from competing against other dealers in the same brand; hence intrabrand competition is reduced. But these restraints may also achieve efficiencies that stimulate competition between brands." (*Eiberger, supra*, 622 F.2d at pp. 1075–1076.) In assessing whether a violation had occurred, the court had to "weigh any enhancement of inter-brand competition against the restrictive effect on intrabrand competition," "determine whether the restraints [were], in all the circumstances, reasonable," and "look to the history of the restraint itself, to the problem perceived by the manufacturer and the goal sought to be achieved, and to the actual effect of the restraint." (*Id.* at p. 1076.) Given that formula and the facts, the district court did not err. (*Ibid.*)

There were two main findings that dictated the outcome. "First, [the district court] found that the principal purpose of the 1975 warranty plan was not to assure that the users of Sony dictation equipment secured warranty service but was rather to enforce the territorial divisions reflected in the dealership agreements. Second, the [district court] found that the effect of the new system 'would be the elimination of intrabrand competition within each authorized dealer's territory.' [Citation.]" (*Eiberger, supra*, 622 F.2d at pp. 1076–1077, fn. omitted.)

We now turn to the Independent Dealers' position. They contend: "In the instant case, the [complaint] alleges that Verizon refuses to pay commissions for sales made by [the] Independent Dealers but does pay commissions for identical sales made by its own stores . . . . The allegations in the [complaint] do not reveal any procompetitive justification for this practice. On the contrary, they clearly suggest that the true motive behind Verizon's discriminatory commission structure is to prevent the [Independent Dealers] from discounting." The Independent Dealers suggest that Verizon's conduct violates the policy and spirit of the antitrust laws and creates an effect similar to an antitrust violation.

Reflecting on this argument proves difficult. First, it assumes allegations that the Independent Dealers never made. The complaint does not allege, for example, that Verizon pays commissions to its own stores.[6] Nor does it allege that the Independent Dealers never receive commissions. Second, while *Eiberger* involved vertically imposed territorial restrictions on intrabrand sales by authorized dealers, the case at bar does not involve any such allegations. Third, there were separate entities and anticompetitive contracts in *Eiberger*, but not here. It is only in the reply brief that some light is finally shed on why Independent Dealers direct us to consider the *Eiberger* decision. There, they claim that though this case is by no means identical to *Eiberger*, "both cases are based on exactly the same public policy concerns, namely the protection of discounters and the promotion of price competition."

The discrepancy about the true contents of the complaint aside, our initial hesitation with trying to compare the commission structure to the facts in *Eiberger* is that, legally, these two cases are apples and oranges. *Eiberger* was the result of section 1 of the Sherman Act. Count II, if anything, implicates the polices underlying section 2 of the Sherman Act. As explained

---

[6] We find the Independent Dealers' recapitulation of the complaint perplexing for two reasons. As we have indicated, the complaint never states that Verizon started paying commissions to its own stores. If that were not confusing enough, the trial court's statement of decision indicated that the "commission changes alleged involve Verizon and Verizon stores, not" the Independent Dealers. It is unclear why the trial court made this assumption.

in *Copperweld*, "[c]oncerted activity subject to [title 15 United States Code section] 1 is judged more sternly than unilateral activity under [title 15 United States Code section] 2." (*Copperweld, supra,* 467 U.S. at p. 768.) This is largely because there are countervailing policies involved with title 15 United States Code section 2. "The Sherman Act contains a 'basic distinction between concerted and independent action.' [Citation.] The conduct of a single firm is governed by [title 15 United States Codes section] 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." (*Copperweld, supra,* 467 U.S. at pp. 767–768, fns. omitted.)

Thus, from a policy standpoint, Verizon's conduct does not pose an evil because it and its stores are viewed as a single entity, and because it does not possess a monopoly and it is not threatening a monopoly. Moreover, because we are dealing with a single entity, we do not want to dampen its competitive zeal.

■ To reiterate, we are aware that section 17203 can apply even if a defendant has not violated the antitrust laws. But, simply put, this case falls outside the policy and spirit of *Eiberger*. *Eiberger* protected discounters and price competition by awarding damages to an authorized agent who was damaged by dealership contracts that created a punishment greater than the profit when the authorized agent sold in other territories. Here, there is no allegation that Verizon imposed contracts with punitive provisions on the Independent Dealers. While ABP objected to Sony's interference with discounting, the Independent Dealers make no such complaint. Rather, they complain that Verizon should be forced to cease selling cellular telephones to certain customers, or that it should be forced to *assist* the Independent Dealers financially so that they can discount and compete. We are aware of no case or statute, state or federal, which contains a policy that would force a company to either let its competitors have all of a particular category of sales, or force it to prop up its competitors financially. Having found no such law cited in the briefs, we can only conclude that *Cel-Tech* is not satisfied.

## DISPOSITION

The judgment of dismissal is affirmed.

Verizon shall recover its costs on appeal.

Doi Todd, Acting P. J., and Nott, J.,[*] concurred.

---

[*]Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.